All right, last case we're going to hear is Walker v. Mod-U-Kraf Homes, and Mr. Himes. Judge Niemeyer, Judges Duncan and Agee, good morning once again, and I present to you what I believe is your third and final argument for this morning, which comes to you from the Western District of Virginia in a gender-based hostile work environment sexual harassment case. There are two issues in this appeal. The first is whether the harassment at issue from an objective perspective was severe or pervasive. And the second concerns whether there was enough evidence to get to the jury on the retaliatory discharge claim. I will address both issues before the record. I state that I've ceded some time to my colleague from the EEOC who will address only the first issue. So you might bear that in mind. As I've said, the first question is whether the District Court erred by concluding that the harassment was objectively severe or pervasive. This is the second half of the third element of a hostile work environment claim, which is the only thing I'm going to talk about with respect to that claim. And I should park here for just a moment and say that there's no question from Ms. Walker's perspective that the conduct was subjectively severe or pervasive to the point that it negatively affected her ability to do her job, slowed her down at work, she said, and she was medicated just to get through the day. In granting summary judgment, the District Court did not rule as to the other elements. It limited its ruling to this. Correct. Exactly right, Judge Agee. And that's why that's all I came here to talk about is what I call element 3B of the hostile work environment claim. And so the analysis is informed by this Court's decision in Freeman v. Dahl-Teil Corporation. And the Court there said the objective inquiry is not a mathematically precise test. There's no equation that the Court applies. But the Court looks at a number of factors, including the frequency of the conduct, its severity, whether it's physically threatening or humiliating, whether it interferes with an employee's work performance. And here for just a moment, particularly Judge Niemeyer, you dissented in that case and you said there that this is a case, excuse me, this is not a case where an employer knew that its employee was experiencing harassment but did nothing in response. And in contrast, in this case, I submit to you, that this is a case where the employer knew exactly what was happening and did nothing about it. And looking at this record, looking at this record globally, there are two things that strike me, and that is the pervasiveness of the conduct at issue. It happened barely nearly every day. And the hopelessness that Ms. Walker faced. She complained over and over to her supervisor, her lead person, to her HR person, all of whom said, there's nothing we can do about it. You just have to deal with it. Could I ask you, actually, what is a lead person? Is that a supervisor? And I will ask the employer also. Yes. I didn't quite understand the designation. A lead person would be – I don't know that there's, Judge Duncan, there's any difference between a supervisor and a lead person. A lead person is the person who the supervisor designates to oversee the particular project on a particular shift. And I guess you understand how this workplace works. Maybe not. But this company builds modular homes, and these units move down a slow-moving conveyor belt, and the workers get on the conveyor belt and do certain tasks. Ms. Walker was a trim painter there. She worked in what they called a box trim painting, finishing out the trim in these individual units. That's the production facility that she worked in, largely a male-dominated environment. And the statements that were made objectified women – excuse me, I'm about to lose my voice – objectified women. Do you want to get some water? Yeah, I probably should. Objectified women in a way that a reasonable jury could find that this conduct was severe or pervasive. I mean, the comments – women were referred to there as fresh meat, which is humiliating and degrading to any of the women in this courtroom. Frequently, a coworker, David Mullins, would grab his testicles, gesticulate toward the plaintiff and say, these nuts are looking for you. Say things like, I bet you could holler real loud, couldn't you? A reference to sex. And if you want a blowjob, that is oral sex, go up in that box where this young woman worked. It was just awful humility and degrading. And again, what sets this case apart maybe from some others is that it happened every day, and she complained over and over. I was about to tell you that she called the 800 hotline to ask for help, and she was told that no one was available to help her. When she called back, she finally got a live person, a young man, who said he would try to help her, but she didn't hear from him. She called back, and he'd been fired. So she did everything you would expect a reasonable woman to do. And these comments just objectified women in a way that drove her to the doctor. She had to be medicated to get through the day. So my only point is the jury should have been able to take a look at this to see whether a reasonable, objective woman should have had to put up with this kind of thing. So my opponent says, I want to park here for just a moment. He says the language is not actionable because you can hear it on the radio or on television or in hip-hop lyrics. And my response is a simple one. That's not the test that defines whether comments are actionable under our law. I mean, in addition, I say Ms. Walker can turn the radio on or off. She can't turn her workplace on or off. She's got to show up every day, represent, try to make a living, and that's what she did. So my opponent also concedes on brief that some of the comments may have been pervasive, and that's absolutely true. It happened every single day. Yes? Do you run into any difficulty on the basis of sex component? Because it appears that this objectionable conduct was directed at men and women. The discrimination was fairly nondiscriminatory. That, of course, is the second element of the hostile work environment claim. And the answer is we do not. The district court did not bite on that argument, and neither should you. In fact, it didn't even address it. That's why we've not really addressed it on brief either. It's thrown in as a kitchen sink argument. And while it is true that some of the statements were made in the presence of men, Judge Duncan, as Ms. Walker was always in the presence of men, that doesn't turn it into an equal opportunity employer situation in any way, shape, or form. I really don't have a lot more to say about that because the district court had nothing to say about it. And I'm nearing the end of my time. If I may return to retaliatory discharge, I'll answer any more questions I'll be happy to about the first component. Well, I'll move on to that with the time that I have left. The second point that we make is that to establish a retaliatory discharge claim, I'm not telling you anything you don't already know. Walker must prove three things. She engaged in protected activity. She suffered an adverse employment action. And those two things are causally related. The first and second elements are not in dispute. She obviously complained over and over. And second, she was fired. And so the issue is whether there was enough evidence to go to the jury on the causally related prong, the third prong, and we submit that there was. Now Walker says that it fired, excuse me, Modgecraft says it fired Walker because she poked her tormentor in the chest while she was begging and pleading with him to stop tormenting her. That's what Modgecraft says. Factually, she denies that that ever happened. The district court said that it does not matter at all whether Walker poked him with her finger. All that matters is whether the plant manager believed that she poked him with her finger. In other words, the district court's view, reality doesn't matter. The only thing that matters is the company's perception of reality. And that's not the law in this circuit. I just – the O'Coley case, just for example, held that because a jury could credit the plaintiff's evidence that the proffered revisions were protectual, it should be for the jury to determine whether the nondiscriminatory reasons were the true motivation for the plaintiff's termination. Well, the employer didn't just leak the judgment on that point. It did interview a number of employees who supported that version of the event. But it interviewed some people. But you note it didn't interview Ms. Walker. And I took the deposition of the plant manager. She said, I don't really care what she had to say. And so with that, there was an interview. There was a process. And the gentleman who was tormenting her got into an altercation with Ms. Walker's boyfriend. Ms. Walker stepped in the middle and said, in essence, stop harassing me. And that was the reason why they fired her. But you have to consider, Judge Duncan, the totality of the circumstances. Now look, after they fired her, they issued a piece of paper to her saying, your performance was good and you're eligible for rehire. And my only point is, that's something a jury ought to be able to consider. The court doesn't blindly accept what the employer says. And again, this is a case where the employee was harassed over and over for an extended period of time. And the company did absolutely nothing. And next, the company's sexual harassment policy is dysfunctional. There's no anti-harassment training. When you call the hotline, there's nobody there to help you. Walker's complaints. Didn't Craigor speak to Mullins at one point? Yes. Yes. Craigor spoke to Mullins at one point. I don't know what he said, but he spoke to Mullins at one point. And then for a week or so, he stopped harassing her. And then it started up again. That's a terribly familiar fact pattern before this court in these hostile work environment cases. And the point to be made is, whatever he did wasn't enough. And I say that as a matter of law. But as a matter of fact, a jury should have been able to pass upon whether the company took adequate remedial measures. And so when the plant manager learned of the harassment, he immediately fired Ms. Walker and kept the harassers. And at least as of the time we took their depositions, they were still working there. This company has an undisputed history, this is in the record, of firing people who complain about unlawful employment practices and terminating employees for false reasons. And this very manager, plant manager, was sexually harassing two other women and was later fired by the company because he was a dishonest person. So all that goes into the calculus, goes into the mix. And for those reasons, we think this case should have gone to the jury. Once again, I'll answer any questions you may have. If not, I'll save three minutes of my time. Thank you. Let me just ask you. Yes, sir. I was just looking here. I thought I remembered this. In the opinion, the court said additionally it is undisputed that these comments were not directed at Walker specifically and that they were instead made to male and female employees alike. And then it cites the case that we have previously recognized that there is a difference between generalized statements that pollute the work environment and personal gender-based remarks that single-eyed individuals ridicule. How much experience teaches the latter to have a greater impact on the listeners and are more severe forms of harassment? I guess what the court is saying about the pervasive is that if you take the comments that really were repetitious, and they were done to both castees and the defendants, I mean plaintiffs, and treat those as not discriminatory in nature, but they were just said to everybody, male, she wouldn't even round them, then you have a different assessment. And the court did take into account to some extent that some of these remarks were sex-neutral, so to speak, orish, but sex-neutral. That is what the court said. And I would say only what I said to Judge Duncan. And what the evidence was, if I turn to your clerk and say, if you want to have oral sex, go to her office, because that's where you can find it, and you gentlemen overhear it, to me that does not turn that person into an equal opportunity harasser. There's not one comment that was directed toward a male. Every single comment was directed to Ms. Walker, though she was often in the presence of men who worked there. And so that is not the line of equal opportunity harasser cases that we typically see before this court. And the power of gender was behind every degrading remark here. It was all referenced to providing sex. These testicles are looking for you, looking right at Ms. Walker when he said it. I was saying the same thing to Cassidy alone, going by Cassidy. And he was, you know, they were dating, as you know. They were dating. And it looks to me like they were making fun of the fact that the two were dating. And Cassidy was pretty sensitive to that stuff, too. He filed his own complaint. Okay, well, why don't we hear from Mr. O'Keefe. Enough said. Thank you. I think they are third. Is the EEOC acting as rebuttal on this, or are you joining? Okay, we've got it wrong there, then. You want your time now. Okay. May it please the Court, my name is Elizabeth Theron, and I represent the EEOC. The Commission filed a brief in this case to address certain legal concerns that tend to really recur in the analysis of these hostile work environment cases. This Court has a very robust and detailed body of case law on hostile work environments and sex harassment. And as we argued in our brief, the facts of this case fit comfortably within the range of scenarios that this Court has held sufficient to go to trial. Beginning with Judge Duncan's question about because of sex, the Court purported not to rule on because of sex, but it did, as Judge Niemeyer said, go on to sort of make this observation that these comments were made to men and women. Now, first of all, the fact that they were made in the presence of men and women, and that they were made to men. I thought there was a specific footnote in the District Court's opinion that said that because of the ruling on the severe and pervasive factor, it did not need to address any of the others. That's right, that's what the Court said. But then later on, in the same opinion, when it was discussing the severity issue, because it never really addressed pervasiveness. In theory, that would mean that if the plaintiff prevailed here on the hostile work environment claim, there would still be a proceeding in the District Court on the other elements. Correct, that would be one option. You could vacate and remand in different ways, but that would be one of them, yes. I take it you're saying that although the District Court specifically said that it was not ruling on it, it did comment on the extent to which a lot of the inappropriate commentary was, in its view, directed toward men and women. Right, yes, Your Honor. And just to be clear, and I want to address also, this is a point Judge Niemeyer just made, even assuming that the these nuts remarks, because that's all we're talking about, there's actually other tremendous evidence of sexual harassment directed exclusively at Walker and female colleagues that was repetitive on a daily basis. So the these nuts remarks are far from the only universe that we're talking about. But even assuming that we are, the fact that they were made to Cassidy, the fact that they made them to anybody who would listen, you don't remove them from the constellation of the environment. That's what Uncal teaches. You look at the totality of the circumstances as to a reasonable person in the plaintiff's position and ask whether she would perceive the environment, as this Court said in Hoyle, the environment as discriminatory on the basis of sex, not picking out particular statements and saying this one is or this one isn't. So it all feeds into the whole picture. And I'll also point to this Court's decision— This is a very difficult area, the dividing the line between gross, boorish comments and sexually based comments, simply because the language of the street is often couched in sexual context. For instance, the F word, I think, is originally a sexual connotation word. And similar types of words, and yet that's used by men and women alike in about 25 different ways and maybe more. And so I don't want to catalog the words, but it's hard to say if the environment, everybody's using the F word, you say, oh, it's a sexually hostile work environment. It's hard to say that. I think you have to—there's some subtle distinctions that have to be made. I think that, if I may, that's absolutely right, Your Honor. And this is why the Supreme Court in Harris and on Cali and this Court over and over again has said that these are tremendously context-specific cases. And you look at the totality of the circumstances. I don't believe the F word is in this record, so— I'm using that as a hypothetical. Right, exactly. But if I can just briefly go through, these are the remarks that were made to Ms. Walker specifically. She's called fresh meat. Every time she walks past Mullins and his friends, and keep in mind, she has to go past them to go to the bathroom. They snicker. They stick their tongues out. They say, hey, come here. After she begins dating Mr. Cassidy, Mullins says, there she goes, there it is, to her two to three times a week and sometimes grabs his crotch and starts hollering, oh, oh, oh, at her. Ricky Adkins, who is a manager, told her that if she would give Cassidy a rest, his blood pressure wouldn't be so high. Cassidy testified that—she testified that Mullins said when she was hanging trim near him, oh, I bet you could holler real loud, couldn't you? And then, of course, we've discussed the blowjob incident and the wiener-in-the-mouth incident. And, again, this court in Oakletree had occasion to address the lyrics of a certain song, which I won't repeat because they don't do anybody any favors. But this court, sitting on bunk, was able to see that based on the context of the words that were being sung, even though there were men present, the song was directed at Ms. Oakletree. And, again, here the same thing. You know, it's been argued that because Mullins and his friend turned around and said wiener-in-your-mouth to the two of them, it was directed at the two of them. But we would respectfully say that based on context, only one of those two people would have had a wiener-in-her-mouth. Thank you. Thank you. All right. Now we'll hear from Mr. Oakey. Thank you, Your Honor. My name is Jay Oakey, and I represent Modugraft. After carefully reviewing the record and hearing argument, the district court concluded in a transparent 23-page opinion that Walker hadn't forecast enough evidence to survive summary judgment on either her hostile work environment or retaliation claims. And it was right on both points. As to the hostile work environment, Walker's projected evidence could not establish conduct that was so objectively severe and pervasive as to alter the terms of her employment under the factors that this court's case law teaches us to consider. And the bulk of the conduct she was complaining about wasn't based on gender animus. And as to the retaliation claim, Walker just hadn't forecast any evidence that would let a reasonable jury conclude that the company's legitimate, non-discriminatory reason for firing her, that she was involved in a fight in the workplace, was just a pretext. Let me address the harassment for a minute. Why isn't the fact that Mullins was ultimately disciplined for violating the company's anti-harassment policy? That's correct, is it not? That's correct, Your Honor. Why is that not probative, at least to some extent? I think it is probative to some extent, Your Honor, but I don't think it's dispositive. Of course. Right. But I think that is a helpful fact for the plaintiff. The difficulty, the thing that concerns me about this case particularly, is that this isn't an instance in which the employer didn't know what was going on because Ms. Walker complained constantly. And I believe that, and she was told by her lead person, just ignore it. And at one point Mr. Kroeger spoke to Mullins and the behavior abated but didn't resume. So it never seems, the company does not ever seem to have engaged in response to her. And that's what troubles me here. That is one of the hard parts of the case for us, Your Honor. As you said, Kroeger did speak to Mullins on the one occasion after the concerns were brought to her. And you asked earlier about Bernoff's role in the company and whether she was a supervisor. On my reading of the record, a lead person is not really a supervisor. It's a person coordinating work. But she doesn't have the authority to discipline anybody. She can't hire or fire or promote anybody. So she's a person who is directing people like Walker on the line where to go. But she doesn't have the authority. He is someone to whom Walker complains. That's correct. But she didn't have the authority to do anything about it. But Kroeger did. Kroeger did. And he did speak to Mullins once. But that's the extent of what he did. And that wasn't, I'm not sure that that gets to the heart of some of the district court's rulings on these issues, which are still enough to kill Walker's case. Except that we have to view the evidence in the light most favorable to Walker. That's right. And we have to look at the totality of the evidence. But the things that are fatal to her case here are the legitimate non-discriminatory reason and her inability to prove pretext on retaliation. On retaliation. Right. But I'm talking about her. Okay. Okay. So then, right. And if we go to the hostile work environment, she has problems showing objective severity and pervasiveness. And that is a totality of the circumstance. So you get that there. But she has a separate problem with showing that the conduct was motivated by gender animus. Because most of what she's talking about are these nuts comments that happen on a daily basis, but they indisputably happen to men and women alike. And just to correct that misunderstanding, I believe it's pages 655 and 602 in the Joint Appendix that show that Mullins and Young were making these comments to men and women alike. And also Mullins, while you're down there, Joe, he made men and women alike. Yeah, I saw that. But it's also undisputed that there were comments directed specifically at her that she apparently found sufficiently objectionable to report regularly. That's correct. In which the company had some ability to address and failed to do so. That's correct, Your Honor. That gets us to the severity and the pervasiveness of those comments, that subset of comments that's arguably motivated by gender animus, and that she suffered and found subjectively. There's a lot of separate parts, different comments along the line. Why isn't this just so close to the line that it's really not an appropriate topic for summary judgment as opposed to going through a hearing? You've got – it seems like to me that when you put all this together, it's difficult to say that no rational fact finder would find it in favor of the claim. And that's why I think it's very important to pay careful attention to what's in the record because we do have conduct addressed at men and women. You have to look at what she can establish was and wasn't motivated by gender animus, and then of the subset that a reasonable juror could find motivated by gender animus, you have to look at what that really was. How bad is it? There she goes. There it is. That's relatively innocuous, especially in the universe of this Court's case law. Except that her allegation is that it happened all the time, and we do have to read the facts, some of which are ambiguous in the light most favorable to her. That's correct, Your Honor. But if you look at the factors that this Court typically looks at in judging the objective severity of conduct, and my colleague, Mr. Grimes, did recite them, but they establish that the Court has – and the Court's explained that a plaintiff has to clear a high bar to establish objectively severe pervasive conduct. And to be actionable, the conduct has to be so extreme that it alters the terms and conditions of employment. And that's a really important and critically limiting principle in this area of the law because it prevents courts from being drawn further and further into the workplace and being turned into these kind of Article III HR departments where they draw extraordinarily fine lines about what is and isn't appropriate between coworkers in a given setting or a different type of setting. And Walker's evidence can't meet that high bar, right? One of the first elements that we see most commonly in the cases finding hostile workplace, sexual harassment, is a power disparity. There's no power disparity here. We see conduct that's physically threatening. There's no physically threatening conduct here. No one touched Walker. No one propositioned her. But that's what the district court relied on, which may or may not be necessary in the context of a harassment. They're not necessary, Your Honor, but they're critical factors in looking at the totality of the circumstances. And the absolute absence of any of these factors here. She's not the only woman in the workplace, right? The record is full of references to other women, including Catherine McDaniel, who was involved in the decision to terminate her. She's not on the receiving end of personal or gender epithets. It's all of the stuff that we're supposed to look at, and none of it's here. And I understand Judge Agee's question about why doesn't this make it close. She says she was on the receiving end. She says that, but she doesn't allege gender epithets. She doesn't allege the things that we see in these cases, the really unfortunate Anglo-Saxon monosyllables. She says things, you know, there she goes, there it is, fresh meat. Those aren't on par with the stuff that we see in the case. And so we try to put this in the universe of the court's case law, right? You have on the one extreme cases like Fairbrook or Ocoli, where there's obvious sexual harassment, and there are these factors that we're talking about. You get to closer cases, the cases I think Judge Agee maybe had in mind, like Jennings or Ocultry, where it can go either way. And then you have cases on the other end of the spectrum, like Ziske or Lack, where you have more of the stuff that we're talking about here. You have verbal harassment that's not in personal or gender-specific terms. In Lack, you have the cross-grabbing gesture. You have the faking orgasm noises. You have the off-color jokes. You don't have it with the frequency we see here, but you do have it coming from a supervisor, which at least counterbalances that, because power disparity is one of the critical things we look for. And Lack wasn't good enough. You have all that here in the fact that she reported it. Right. And you have that all there in Lack, and Lack didn't state a claim. And that's the point, is that it's not that close a case when you take a step back and look at the universe of the court's jurisprudence on this and then look at what she's actually alleged. The stuff that is frequent, pervasive, is the stuff that's also not related to her gender. And my colleague said that we're making the argument that because you could hear something on the radio, it's not related to gender.  What we are saying, and what this court's case law makes pretty clear, is that even when you're dealing with overtly sexual language, the F word, you have to look at how that language is used in everyday parlance. And these terms that she's complaining about, they're a joke. They're a dumb, sophomoric joke that's well understood. And I'm not saying that because you can hear it on the radio or a CD, it's not sexual harassment. I am saying that because when it's used in this context, that's what it means, and it's not a sexual solicitation. That's an important factor to keep in mind. Another important factor to keep in mind is that men and women are both hearing this. It's pervasive, but it's pervasive going both ways. And that's a significant hurdle for her to overcome, and we know that also from Lack. Further to that point, Cassidy himself understood himself to be the target of this harassment. He filed an EEOC charge. He described what Mullins and Young were doing as harassing him. There's some discussion about whether or not some of these comments were targeted at Walker, and there's no question that she testifies that they're targeted at her. So for the subjective wrong, we concede to her. But at the same time, it's nonsensical to say that some of this stuff is directly targeted at her. For example, when she goes into the box, which is half a house, and then Mullins turns to Cassidy and says to Cassidy, if you want a blowjob, go into that box, she's not even in the same room anymore. She's gone into the house. That's a comment targeted at Cassidy, who has a longstanding and undisputed history of hostility with Mullins and with Brad Regans and, to a lesser extent, with Young. And that's something else that the court has to take into account, is that you have this collection of immature people acting inappropriately in the workplace, and Walker finds herself pulled into it. But that doesn't mean that what she's pulled into is harassment directed at her because of her gender. She's just pulled into an obnoxious, inappropriate situation. I did want to address a couple other points. The undisputed history of firing people who complain about sexual harassment, as I understood it, was based entirely on inadmissible hearsay, and the court shouldn't consider it on appeal. And as to the comments from Ricky Adkins, Robin Walker herself testified in her deposition that she didn't consider those sexual, so they don't meet the subjective prong. I mean, they're not something that we ought to be considering. She didn't even – the plaintiff didn't even consider that sexual harassment directed at her. She just thought it was none of his business. As to the retaliation prong, I did want to address that because that is half of the court's opinion. My colleague set out the case law on that point, and we agree. Where we differ with him is on what the court is to do with our legitimate non-discriminatory reason. The EEOC doesn't challenge that ruling, by the way, from the district court, and that's well advised because it's plainly correct. Ricky Adkins and Catherine McDonald both testified that they jointly decided to fire Walker after conducting an investigation and interviewing nine employees and collecting seven witness statements. And Adkins specifically denied that Modigrat fired Walker in retaliation for complaining about anything. He explained that her termination was the result of being involved in this fight, and that's a perfectly sound basis for firing somebody. And Walker disagrees, but she hasn't forecast evidence that would license the reasonable inference that that's just a pretext. Modigrat's explanation hasn't changed over time. It's not treating similarly situated employees differently. Based on the witness statements that he collected, Ricky Adkins could reasonably conclude that Robin Walker had picked a fight at the workplace. Now, she says, hold up, hold up. We're on summary judgment, and I testified that that's not what happened. But for the purposes of the pretext inquiry, we accept that as objective truth. That's fine. That's what actually happened. But we're looking at the result of the investigation and what Adkins has in front of him to make his decision. And what he has in front of him to make his decision is seven witness statements from nine witnesses who disagree with Walker. Well, I guess not seven. Two of those are Walker and Cassidy. But he has a collection of witness statements that justify what he did. And the courts explained that when it's looking at these decisions, there's a limited extent of judicial review. It's not acting as a super personnel department. And it's not trying to decide whether the supervisor's reason was prudent or fair or right as long as it really was the reason. And in this case, there's no reason to think that it really wasn't the reason that after conducting his investigation, Adkins decided to fire Walker on the basis of the information he collected. So for those reasons, Your Honors, we'd ask the court to affirm the district court's judgment unless the court has any questions. Thank you, Mr. O'Keefe. Mr. Grimes. Thank you. Just a couple of additional comments with respect to same-sex issue. This is exactly the opposite of what my opponent said before the district court in the joint appendix at page 963 beginning at line 7. This is my opponent speaking. I concede to the court, to the district court, that you can have equal opportunity harassment and still find it to be a gender-based claim. That's correct. Today he says exactly the opposite. Maybe that's why we have the footnote from the district court. And maybe the district court, Judge Agee, as you pointed out, will have to review that question somewhere down the road. My opponent says today, and this is the essence of his argument, this was all just a joke. Could you answer, was the finding that Mullins violated Moducraft's harassment policy based on this conduct? This conduct being the sexual harassment? The allegation by Walker. Yes. That he was sexually harassing Walker. Yes. Yes. This wasn't a joke to Ms. Walker. She's nothing special, folks. She's just a working woman trying to make a living. That's all she's doing. When she's harassed, she complained about it. The company did nothing. She internalized what was going on to the point she had to be medicated to work through the day. That ought to go to a jury on any planet, including this planet. And Judge Agee, in conclusion, Hoyle versus Freightliner, spot on to what you were saying. The question at summary judgment is not whether a jury is sure to find for the plaintiff. The question is whether a reasonable jury could find for the plaintiff. That's what this court held in Hoyle versus Freightliner. That's how this court ought to rule today. Thank you. All right. Thank you. We'll come down, recounsel, turn the court for the day, please. This honorable court is adjourned until tomorrow morning at 9.30. God save the United States and this honorable court. Thank you.
judges: Paul V. Niemeyer, Allyson K. Duncan, G. Steven Agee